## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TEAM WARD, INC., d/b/a WAR EAGLE BOATS, individually and on behalf of all others similarly situated, ) ) ) ) | Civil Action No. _____ |
| Plaintiff, ) ) | **CLASS ACTION COMPLAINT** |
| v. ) ) | |
| THE GOLDMAN SACHS GROUP, INC., GS POWER HOLDINGS LLC, METRO INTERNATIONAL TRADE SERVICES LLC, LONDON METAL EXCHANGE LIMITED, LME HOLDINGS LIMITED, and JOHN DOES 1-20 ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. ) ) ) | |

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    SUMMARY OF ALLEGATIONS ..................................................................... 3

III.   JURISDICTION AND VENUE ......................................................................... 8

IV.    PARTIES ............................................................................................................ 9

       A.    Plaintiff ................................................................................................... 9

       B.    Defendants .............................................................................................. 9

V.     SUBSTANTIVE ALLEGATIONS .................................................................. 12

       A.    Goldman Conspires With The LME ..................................................... 12

       B.    Defendants Benefit From Storage Fees ............................................... 15

       C.    Defendants' Agreement that Minimum Means Maximum .................... 17

       D.    Prices Increase ..................................................................................... 19

       E.    Senate Hearings in July 2013 and EC Action ...................................... 21

       F.    The Goldman Defendants Concede They Can Ship at Will .................. 23

       G.    Additional Developments in Furtherance of the Agreements ............... 24

VI.    THE LME's MONOPOLY POWER .............................................................. 25

VII.   THE GOLDMAN DEFENDANTS' MONOPOLY POWER .......................... 26

VIII.  THE RELEVANT MARKETS ........................................................................ 27

IX.    EFFECTS ON INTERSTATE COMMERCE AND INJURY TO
       PLAINTIFF AND THE CLASS ...................................................................... 29

X.     ANTITRUST INJURY .................................................................................... 29

FIRST CAUSE OF ACTION DECLARATORY AND INJUNCTIVE RELIEF
       UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS
       OF SECTION 1 OF THE SHERMAN ACT ..................................................... 32

SECOND CAUSE OF ACTION FOR VIOLATIONS OF STATE ANTITRUST
       STATUTES ....................................................................................................... 35

i

THIRD CAUSE OF ACTION FOR VIOLATIONS OF STATE CONSUMER
    PROTECTION AND UNFAIR COMPETITION STATUTES ....................................... 39

FOURTH CAUSE OF ACTION UNJUST ENRICHMENT ....................................................... 41

**COMPLAINT**

Plaintiff Team Ward, Inc., d/b/a War Eagle Boats ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action against Defendants The Goldman Sachs Group, Inc. ("Goldman"), GS Power Holdings LLC, Metro International Trade Services LLC ("Metro") (together the "Goldman Defendants"), the London Metal Exchange Limited, LME Holdings Limited (together the "LME") and John Does 1-20 (collectively "Defendants"). The following allegations are based on personal knowledge as to Plaintiff's own conduct and are made on information and belief as to all other matters based on an investigation by counsel.[1]

## I.   INTRODUCTION

1.      Plaintiff alleges that Defendants combined, conspired and agreed with one another (and other persons or entities) to artificially limit and restrain the availability of aluminum supplies in the United States in order to earn excessive storage fees and to profit from increases in the Midwest Premium (defined *infra* at ¶7).

2.      Defendants have injured purchasers of aluminum, such as Plaintiff, who indirectly purchased aluminum for physical delivery from February 2010 to the present (the "Class Period"—"Class" is defined *infra* at ¶88) in the United States at inflated prices by unlawfully restraining supplies by, *inter alia*, diverting aluminum from productive uses into warehouses controlled by the Defendants and then engaging in anticompetitive conduct that had the effect of (1) artificially restricting the amount of aluminum supply leaving Defendants' warehouses and entering the market, lengthening warehouse queues and pushing up the cost of sourcing the aluminum out of the warehouses and (2) inflating premiums that aluminum consumers such as

---

[1]   Counsel's investigation includes an analysis of publicly available pricing information, news articles, statements made during Congressional hearings on the manipulation of the aluminum market, other statistics and additional analysis.

Plaintiff are forced to pay. The scheme allowed the Defendants to profit from, *inter alia*, exorbitant rental fees which resulted in increased premiums.

3.    Accordingly, as a direct result of Defendants' violations, Defendants have artificially inflated the price of aluminum and have reaped substantial profits from their anticompetitive conduct. Defendants' conduct proximately and foreseeably caused Plaintiff and members of the Class to suffer injuries by forcing Plaintiff and the Class to pay artificially inflated prices for aluminum throughout the Class Period.

4.    Plaintiff brings this action on behalf of itself and similarly situated indirect purchasers of aluminum in the United States from one or more of the Defendants during the Class Period.

5.    Plaintiff brings this class action lawsuit pursuant to federal antitrust laws and to recover damages under state antitrust, unfair competition and consumer protection laws, and common law principles of unjust enrichment, as well as to recover the costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiff and all other similarly situated Class members sustained as a result of the Defendants' illegal conduct with respect to aluminum.

6.    **Damages:** Defendants have injured purchasers of aluminum, such as Plaintiff, who purchased aluminum in the United States at inflated prices by unlawfully restraining supplies by, *inter alia*, diverting aluminum from productive uses into warehouses controlled by the Defendants and then engaging in anticompetitive conduct to artificially restrict the amount of aluminum supply leaving Defendants' warehouses and entering the market. The scheme inflated daily storage fees charged by the Goldman Defendants and shared with the LME and also allowed the Goldman Defendants to profit from trading positions tied to aluminum prices. As a direct result of Defendants' violations, Defendants have artificially inflated the price of

2

aluminum and have reaped substantial profits from their anticompetitive conduct. Defendants'
conduct proximately and foreseeably caused Plaintiff and members of the Class to suffer injuries
by forcing Plaintiff and the Class to pay artificially inflated prices for aluminum throughout the
Class Period.

7.     Among the prices manipulated by the Defendants' conduct is the "Midwest
Premium" which is the benchmark used for physical trading of aluminum in North America.[2]
The Midwest Premium has doubled during the Class Period, rising from $0.055/lb just prior to
the beginning of the Class Period (in January 2010) to over $0.115/lb by January 2013.[3]

8.     As explained by the *New York Times* in an article (published on July 20, 2013)
revealing details of the Defendants' misconduct and the impact of the misconduct on the United
States' aluminum market, "[h]undreds of millions of times a day, thirsty Americans open a can
of soda, beer or juice. And every time they do it, they pay a fraction of a penny more because of
a shrewd maneuver by Goldman Sachs and other financial players that ultimately costs
consumers billions of dollars."[4]

## II.     SUMMARY OF ALLEGATIONS

9.     The Defendants conspired to artificially restrict the supply of aluminum in the
United States throughout the Class Period.

---

[2] The "Midwest Premium" is also sometimes referred to as the Platts MW Midwest Premium or
the Midwest Transaction Premium price and is the benchmark used for physical trading of
aluminum in North America.     *See* http://www.reuters.com/article/2012/05/08/aluminum-
physical-idUSL1E8G3NC120120508, last visited Dec. 20, 2013.

[3] *See*, US Midwest Premiums – The Method Behind the Madness, available at,
http://www.crugroup.com/about-cru/cruinsight/US_midwest_premiums, last visited Dec. 20,
2013.

[4] David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK
TIMES, July 20, 2013, (the "July 20 NY Times Report").

3

10.     The LME establishes rules for the warehousing of exchange traded aluminum in the U.S. The rules for LME regulated warehouses, such as Metro, were influenced by interested parties such as Goldman who sat on the LME's Executive Committee which was responsible for, *inter alia*, making warehousing related policy recommendations to the LME. Among other things, LME rules established minimum withdrawals of metals required by LME approved warehouses and also set daily storage fees facilities could charge customers. Under LME rules, purchasers receiving commodities stored in LME approved warehouses were charged a fee of $0.40 per ton of aluminum per day stored (at the start of the Class Period). According to the July 20 NY Times Report, the rate increased to $0.48 per ton of aluminum per day stored by the end of the Class Period. The LME benefits from fees charged by warehouses by taking approximately 1% of warehousing fees.[5]

11.     Goldman purchased Metro in February of 2010. Goldman's acquisition of Metro not only gave the Goldman Defendants an income stream from guaranteed storage fees, estimated by the *New York Times* to be a "quarter-billion dollars a year," but it also provided Goldman a platform to influence commodities prices to benefit its trading positions.

12.     Other financial institutions such as JPMorgan Chase & Co. ("JPMorgan") may also have profited from the scheme set forth herein. Near the time of Goldman's acquisition of Metro, JPMorgan in 2010 acquired control of Henry Bath, a UK-based metals warehousing company that owns and operates LME-approved aluminum storage networks.[6]

---

[5] *See* London Metals Exchange, http://www.lme.com/trading/fees/warehouse/, last visited Dec. 20, 2013.

[6] *See* Javier Blas, *Goldman and JPMorgan enter metal warehousing*, FINANCIAL TIMES, Mar. 2, 2010.

4

13.     As alleged herein, Goldman and the LME conspired to abuse their dominance over the aluminum warehouse market in the United States to artificially delay the removal of aluminum from Metro, thereby increasing their storage fees and simultaneously constricting the supply of aluminum in the United States market which increased aluminum prices (including as a result of inflating the Midwest Premium) during the Class Period.

14.     The Defendants' scheme was executed on several fronts.  First, Goldman provided financial incentives to aluminum producers and traders to store aluminum in Metro. The incentives led to the Goldman Defendants amassing a huge stockpile of aluminum, increasing the aluminum in their warehouses from 850,000 tons to over 1.5 million tons during the Class Period.[7]

15.     Second, the Defendants created artificial delays in retrieving aluminum from storage which lengthened storage times and increased the accompanying storage fees paid to Goldman (and through Goldman to the LME).  Specifically, the LME had put in place requirements, purportedly to protect buyers, that warehouses must deliver a certain amount of metal every day.  However, by agreeing that minimum customer delivery requirements could be interpreted as maximums without penalty, the Defendants proceeded to slow deliveries to the bare minimum permitted.  In addition to treating the minimums as maximums, Defendants also agreed that the total shipments required could be "netted", which in effect allows the warehouse operators to count a shipment from one warehouse to another warehouse owned by the same operator against the daily LME minimum withdrawal requirement.  The agreement created a bizarre scenario, described by one forklift operator quoted by the *New York Times*, as a "merry-go-round of metal," moving between Metro warehouses in the Detroit area while customers'

---

[7] *See* July 20 NY Times Report.

delivery times for withdrawing aluminum increased from a few weeks (before Goldman acquired Metro) to several months.

16. The constrained supply artificially increased, *inter alia*, the Midwest Premium, and forced class members to purchase aluminum at artificially inflated prices. For example, the Midwest Premium price has doubled during the Class Period, rising from $0.055/lb just prior to the beginning of the Class Period (in January 2010) to over $0.115/lb as of January 2013.[8] According to the *New York Times*, "the efforts by Goldman and other financial players has cost American consumers more than *$5 billion* over the last three years. . . ."

17. Goldman and the LME benefitted from increased storage fees and Goldman, given its role as a commodities trader, gained intelligence it could use to benefit its trading positions. As explained by Jason Schenker, president and chief economist at Prestige Economics "[i]nformation is worth money in the trading world and in commodities, the only way you get it is by being in the physical market . . . So financial institutions that engage in commodities trading have a huge advantage because their ownership of physical assets gives them insight in physical flows of commodities."[9] This is exactly the position Goldman enjoyed as Metro's owner and a director of the LME.

18. As illustrated in the graphic below, during the Class Period LME warehouses (such as those owned by the Goldman Defendants and JPMorgan) attracted stockpiles of aluminum through incentives. Defendants then delayed outflows and profited from rents charged on the stored aluminum. The suppressed supply caused by the Defendants' scheme

---

[8] *See,* US Midwest Premiums – The Method Behind the Madness, available at, http://www.crugroup.com/about-cru/cruinsight/US_midwest_premiums, last visited Dec. 20, 2013. (stating, "cash incentives [offered by the Goldman Defendants] have essentially created a 'floor' under the [Midwest Premium price], as they are in direct competition with one another.")

[9] *See* July 20 NY Times Report.

inflated premiums added to aluminum sales in the United States. The artificially inflated premiums are passed on to purchasers of physical aluminum, such as Plaintiff and members of the Class, based on the Midwest Premium price which is used as a benchmark for pricing aluminum across North America:



19. As a result of the agreements between the Defendants, purchasers of aluminum have been damaged. By the allegations contained herein, Plaintiff seeks redress for the Defendants' anticompetitive conduct.

### III.   JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 15 U.S.C. §§7, 15(a), and 26.  Additionally, this Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action, including claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil Procedure; there are thousands of potential Class members; the aggregate amount in controversy exceeds the jurisdictional amount or $5,000,000; and Defendants are citizens of a State different from that of Plaintiff and the Class.

21.     This Court also has jurisdiction over this matter under 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337 because Plaintiff brings claims under section 16 of the Clayton Act, 15 U.S.C. § 26, for injunctive and equitable relief to remedy the defendants' violations of the Sherman Antitrust Act, 15 U.S.C. § 1. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

22.     This Court has jurisdiction over the Defendants because they are present in the United States, do business in the United States, have registered agents in the United States, may be found in the United States, and are otherwise subject to the service of process provisions of 15 U.S.C. § 22.

23.     Venue is proper in this district under 28 U.S.C. § 1391(b) and 15 U.S.C. §§1, 2, 7, 15, 22 and 26.  Defendants do business in this district, several of the Defendants have offices in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

IV.    <u>PARTIES</u>

**A.    Plaintiff**

24.    Plaintiff Team Ward, Inc. is a boat builder specializing in the manufacture of aluminum hull boats designed for hunting and fishing.  Plaintiff purchases substantial quantities of processed aluminum for its manufacturing operations.  Team Ward does business as War Eagle Boats.  Plaintiff was damaged in its property and business by purchasing aluminum at prices artificially and intentionally inflated by the conduct of Defendants as alleged herein throughout the Class Period.  Plaintiff has suffered antitrust injury by transacting in the relevant market in which Defendants were intentionally and artificially inflating prices.

**B.    Defendants**

25.    Defendant LME is the primary exchange for global trading of industrial metals.[10] Trading on the LME includes buyers and sellers in both the market for physical delivery of aluminum (i.e. purchasers like Plaintiff for use in industrial or manufacturing applications) and financial traders.  The LME is located at 56 Leadenhall Street, London EC3A 2DX, United Kingdom and does business in the United States and in this District by, among other things, promoting its exchange among U.S. market participants including through business meetings and also through the warehousing activities alleged herein, and licensing of warehouses in the U.S. According to the LME's website, "[the LME] is the world centre for industrial metals trading and price-risk management.  More than 80% of global non-ferrous business is conducted here and the prices discovered on our three trading platforms are used as the ***global benchmark***."[11] Among its various functions, the LME maintains a large network of storage units for its traded

---

[10]    *See* London Metal Exchange, London Metal Exchange: Home, available at: http://www.lme.com/, last visited Dec. 20, 2013.

[11] *See id.* All emphases herein are added.

9

commodities, such as aluminum.  LME approved warehouses are located across the United States.

26.    Defendant LME Holdings Limited is a corporation that, until December 6, 2012, owned the LME.  On December 6, 2012, the LME was acquired by the Hong Kong Exchanges & Clearing.[12]   Until LME Holdings' sale, the Goldman Defendants were its second largest shareholder holding approximately 1.23 million shares (nearly 10% of the shares).  JP Morgan was the largest shareholder of LME Holdings with approximately 1.4 million ordinary shares (approximately 11%).[13]

27.    Defendant Goldman is one of the largest investment banking, securities and investment management firms in the world, providing a broad array of financial services. Goldman is located at 200 West Street, New York, New York 10282.  Prior to the beginning of the Class Period, Goldman traded extensively in commodities, including aluminum, on the LME and was a shareholder of LME Holdings.

28.    Defendant Metro is a LME-certified warehouse, specializing in the storage of metals, including aluminum, for the LME.  Metro was acquired by Goldman in February 2010 and operates as a subsidiary of GS Power Holdings LLC.  As of March 8, 2013, Metro operated 29 out of a total of 37 LME-listed storage facilities in the Detroit metropolitan area, also referred to herein as "Midwest Warehousing" area.  Metro is located at 6850 Middlebelt Road, Romulus,

---

[12]  *See   HKEx   and   LME   announce   completion   of   transaction*,   Dec.   6,   2012, http://www.lme.com/news-and-events/press-releases/press-releases/2012/12/hkex-and-lme-announce-completion-of-transaction/, last visited Dec. 20, 2013.

[13]  *See* Douwe Miedema, *JP Morgan to buy MF Global's LME stake*, Reuters (Nov. 22, 2011) http://www.reuters.com/article/2011/11/22/us-jpmorgan-lme-idUSTRE7AL1AJ20111122,   last visited Dec. 20, 2013.

Michigan. Metro's Michigan facilities house approximately one quarter of the aluminum stored in LME facilities globally and over 70% of the available aluminum in North America.[14]

29.   Defendant GS Power Holdings LLC is an intermediate subsidiary of Goldman that is the immediate parent of Metro and is located at 85 Broad Street, New York, New York 10004.

30.   Relationships between Defendants are illustrated in the below visual representation of the allegations herein.



31.   The John Doe Defendants 1-20 are other persons who have engaged in the agreements alleged herein, including warehouse owners situated similarly to the Goldman Defendants.

---

[14] July 23, 2013 Statement of Tim Weiner, Before the Senate Banking Committee, at pp. 15-17, ("Weiner Testimony").

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Goldman Conspires With The LME

32.    In late 2008 and 2009, domestic aluminum storage increased as manufacturing activity slowed following a downturn in the U.S. economy.  The buildup of aluminum gave owners of LME approved warehouses an opportunity to increase revenues from rents associated with housing aluminum.  Additionally, since the LME receives 1% of fees earned by LME approved warehouses, increases in rents from storing aluminum directly benefitted the LME.

33.    Goldman purchased Metro in February of 2010 for $550 million.  The acquisition not only gave Goldman the ability to control a critical component in the distribution of aluminum in the United States but it also gave Goldman a voice on the LME Warehouse Committee, through Metro's existing seat.[15]  The LME Warehouse Committee makes recommendations to the LME's Board regarding warehousing requirements, including, for example, minimum delivery requirements and storage fees.

34.    The LME's Warehouse Committee plays a critical role in setting the rules and regulations that govern their own operations, such as "Assisting … with the formation of working groups to advise [the LME's Executive Committee] on warehousing issues (e.g. structure of warehouse agreement, location policy, capacity constraints)…[and] [m]aking recommendations to [the LME's Executive Committee] on warehousing related policy issues."[16]

35.    Goldman's acquisition of Metro also gave it business intelligence to benefit its trading activities.  According to the *New York Times*, "By controlling warehouses, pipelines and

---

[15]    *See*    London    Metal    Exchange,    http://www.lme.com/about-us/corporate-structure/committees/warehousing-committee/, last visited Dec. 20, 2013.

[16]  London Metal Exchange, Warehousing Committee Terms of Reference, available at: http://www.lme.com/~/media/Files/Committees/Committee%20Terms%20of%20Reference/Warehousing%20Committee%20Terms%20of%20Reference.pdf, last visited Dec. 20, 2013.

ports, banks gain valuable market intelligence, investment analysts say. That, in turn, can give them an edge when trading commodities."

36. Similarly, JPMorgan in 2010 acquired control of Henry Bath, a UK-based metals warehousing company that owns and operates one of the largest LME-approved global metal storage networks, including aluminum.[17]

37. Like Metro, Henry Bath is represented on the Warehousing Committee of the LME, which helps to establish rules for the warehousing of exchange traded aluminum in the U.S.[18] In effect, JPMorgan as 100% owner of Henry Bath has a "seat at the table" when it comes to establishing rules for LME-regulated warehouses.

38. As recently stated in testimony before the Senate Committee on Banking, Housing, and Urban Affairs, Subcommittee on Financial Institutions and Consumer Protection (July 23, 2013), "Ownership of the key LME warehouses by large commodity traders with integrated financial and physical metals operations allows them to control the supply of aluminum to commercial users and, as a result, to control prices. This led other market participants to worry about unfair advantage for such firms, as they now can use their knowledge of how much metal is stored, as well as their ability to control delivery of physical metal to consumers, to determine their own trading strategies."[19]

---

[17] *See* July 23, 2013 Statement of Professor Saule Omarova, Univ. of N.C., Before the Senate Banking Committee, at p.17 ("Omarova Senate Testimony"); *see also*, Mike Jackson, *Henry Bath & Son: A Company and family History* http://www.henrybath.com/assets/_files/documents/jun_11/HENRYBATH__1308588481_Complete_Henry_Bath_History.pdf, last visited Dec. 20, 2013.

[18] *See* London Metals Exchange, http://www.lme.com/about-us/corporate-structure/committees/warehousing-committee/, last visited Dec. 20, 2013.

[19] Omarova Senate Testimony at pp. 15-16.

39.    "Goldman is one of the largest traders of derivatives in the metals markets. Unlike an independent warehouse operator, Goldman can potentially use its storage capabilities not only to generate rental income but also to move commodity prices in a way that would benefit its derivatives positions. . . .  As one of the world's biggest dealers in commodity derivatives, Goldman can devise and execute highly sophisticated trading strategies across multiple markets.  The ability to influence prices of physical assets underlying derivatives, in effect, completes the circle.  It makes Goldman's derivatives profits not so much a function of its traders' superior skills or executives' talents, but primarily a function of the firm's *structural market power*."[20]

40.    Likewise, there are similar questions concerning "risks to the financial system by [JPMorgan's] ownership of warehouses and plants and whether [JPMorgan's] holdings of these assets constitutes a concentration of market power that has increased bank profits at the expense of consumers."[21]

41.    In contrast to securities markets, commodities markets are particularly vulnerable to so-called market power-based manipulation that may not involve fraud or deceptive conduct. A large trader can significantly move prices of futures and underlying physical commodities not only by "cornering" the market in a particular product but also by placing very large sell/buy orders in excess of available liquidity.  This salience of market power in commodities market manipulation underscores the potential dangers."[22]

---

[20] Omarova Senate Testimony at pp. 22.

[21] *See* Christian Berthelsen, *Senate Panel Opens Probe of Banks' Commodities Businesses; Information Requested From J.P. Morgan Chase, Goldman Sachs and Morgan Stanley*, WALL STREET JOURNAL (July 30, 2013).

[22] Omarova Senate Testimony at pp. 23.

42.     Thus, by the start of the Class Period, Goldman owned one of the largest aluminum warehouses in the United States, was on the rules committee for determining the amount of aluminum that could leave its warehouse, would directly benefit from rents charged for delays in releasing aluminum and had a trading desk who could profit from intelligence gained from Goldman's control of Metro and its position on the LME.

**B.     Defendants Benefit From Storage Fees**

43.     Defendants have received hundreds of millions of dollars annually in storage revenues during the Class Period through artificially high storage rates combined with intentional and grossly inefficient delays in aluminum delivery.[23]  These revenues constitute an artificial and unreasonable cost that is only possible as a result of monopoly pricing power and abusive agreements in restraint of trade.  As detailed herein, Defendants conspired to preserve their ability to charge excessive fees by increasing aluminum supplies in Goldman's warehouses while simultaneously restricting the supply in the United States.

44.     According to the *New York Times*, "[a]fter Goldman bought [Metro] in 2010, Metro International began to attract a stockpile [of aluminum]."

45.     The first step in Goldman's effort to increase inventory was based on granting financial incentives to aluminum producers to park aluminum in Goldman's facilities.  Through the incentive program, the Goldman Defendants, with the consent and agreement of the LME (and also to the LME's direct financial benefit) made a series of agreements in restraint of trade to further consolidate its market dominance (and ability to charge supra-competitive prices) by offering incentives to metals producers and traders to attract and divert more aluminum into its

---

[23] *See* the July 20 NY Times Report.

warehouses.[24]  Additionally, aluminum is attracted to warehouses controlled by the Goldman Defendants by incentives on storage lease renewals or "rewarranted."  By way of background, when a LME aluminum forward contract matures, delivery of "warrants" for aluminum in a LME warehouse must be made by sellers who have not liquidated (i.e., traded out of their contract) to buyers who have not liquidated.  A warrant is the document of title to aluminum stored in an LME certified warehouse.[25]  It takes the form of centrally-maintained electronic records under the LME's electronic records system.  Each warrant represents a specific physical lot; a specific non-interchangeable tonnage and brand.  In order to maintain the warrant system ("rewarrant"), the LME certifies and makes agreements with warehouse owners to store aluminum, including agreements with the Goldman Defendants.

46.     As a result of these incentives, supplies of aluminum in warehouses owned and controlled by Defendants are reported to have increased from approximately 850,000 tons (at the start of the Class Period) to nearly 1.5 million tons (currently).[26]

47.     Midwest Warehousing, which includes aluminum storage in the greater Detroit metropolitan area and Midwestern United States, houses approximately one quarter of the aluminum stored in LME facilities globally and over 70% of the available aluminum in North America.[27]

---

[24] See Tatyana Shumsky and Andrea Hotter, *Wall Street Gets Eyed in Metal Squeeze*, THE WALL STREET JOURNAL, June 17, 2011.

[25] See London Metal Exchange, http://www.lme.com/sitecore/content/site/site-global-content/glossary/w/warrant/, last visited Dec. 20, 2013.

[26] See July 20 NY Times Report.

[27] See Pratima Desai, Clare Baldwin, *Goldman's New Money Machine: Warehouses*, REUTERS.COM, Jul. 29, 2011 ("2011 Reuters Article") (also stating that, in the first six months of 2011, "Metro warehouses in Detroit took in 364,175 tonnes of aluminum and delivered out 171,350 tonnes," which "represented 42 percent of inventory arrivals globally and 26 percent of

### C. Defendants' Agreement that Minimum Means Maximum

48.     While stockpiles were increasing, the Defendants took specific steps to artificially restrict the supply of aluminum into the market.  Specifically, the Goldman Defendants (and John Does 1-20), as members of the LME Warehouse Committee, maintained an agreement with the LME that required a minimum of 1,500 tons (later increased to 3,000) of metal per city to be released each day.

49.     The minimum release requirement purportedly satisfied purchaser demand. However, implicit in the shipping requirements was an agreement that (i) the "minimum" could readily be treated as a maximum with no penalty, (ii) the "minimum" applied to an entire city (i.e., no percentage-per-warehouse shipment was required)—allowing Goldman to take advantage of the massive concentration of warehouse space in Midwest Warehousing to essentially render the shipping requirement meaningless, and (iii) allowed "netting" of incoming shipments which encouraged "shuttling" of shipments between Metro-owned warehouses (e.g., a shipment from one of Goldman's warehouses directly to another would count against the daily quota).

50.     In practice, the Goldman Defendants treated the LME minimums as maximums, which was not a violation of the requirement and was done with the ongoing knowledge and consent of the LME.  Moreover, the "netting" and "shuttling" of shipments allowed Goldman to shuffle aluminum between its facilities (thereby facially meeting the LME's minimum release requirements) without actually releasing commodities from warehouse storage into the market.

---

the metal delivered out."), available at, http://www.reuters.com/article/2011/07/29/us-lme-warehousing-idUSTRE76R3YZ20110729, last visited Dec. 20, 2013.

51.     As a result, Metro warehouse workers have reported that they routinely saw the same truck drivers making three or more round trips each day between Goldman warehouses.[28] For example, Tyler Clay, a forklift driver who worked at the Metro warehouses reportedly called the process "*a merry-go-round of metal*."[29]    According to Mr. Clay, while aluminum was delivered in huge loads by rail car, it left in a relative trickle by truck.

52.     The combination of increasing supplies coupled with Defendants engaging in shipping shenanigans to meet minimum release requirements artificially delayed the amount of aluminum entering the market.    According to the *New York Times*, from the time Goldman acquired Metro, wait times to withdraw aluminum from Metro have grown from an average of six weeks to more than sixteen months, a ten-fold increase.[30]    The delays occurred despite Goldman having the ability to locate and release specific lots of aluminum very quickly. According to another Metro forklift operator cited by the *New York Times*, "It's all in rows... You can find and get anything in a day if you want. And if you're in a hurry, a couple of hours at the very most."[31]    "[The delays allowed Metro to] continue charging a daily rent of 48 cents a ton... [and] at current rates [the Goldman Defendants] could collect about a quarter-billion dollars a year in rent."[32]

---

[28] *See* NY Times Report.

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

53.    In 2011, the LME hired Europe Economics to assess the chorus of purchaser complaints regarding warehouse delays.[33]  The Europe Economics report contained a number of policy recommendations, including that the implementation of rent rebates for material that is 'stranded' in a queue should be the subject of further discussion.  Citing only "feasibility issues", the LME refused to adopt the recommendation to even discuss the issue.[34]

### D.    Prices Increase

54.    The cash incentives offered by the Goldman Defendants have essentially created a 'floor' under the Midwest Premium price as they are in direct competition with one another.[35] As a result of treating minimums as maximums, and sending aluminum shipments in circles on the "merry-go-round," the Midwest Premium price for aluminum has nearly doubled during the Class Period.[36]

55.    By intentionally shifting both the demand curve and the supply curve for delivery of aluminum, Defendants have increased prices paid by purchasers of aluminum for delivery in the United States based on the Midwest Premium price and any contact prices based on or derived from the Midwest Premium.

56.    As a result of these anticompetitive agreements, the Goldman Defendants' storage charges are higher than storage rates in a non-manipulated market.  Moreover, contrary to general economic indicators in a generally improving economic environment, the Defendants'

---

[33] *See* http://www.lme.com/en-gb/trading/warehousing-and-brands/warehousing/warehousing-studies/, last visited Dec. 20, 2013.

[34] *Id.*

[35] *See*, US Midwest Premiums – The Method Behind the Madness, available at, http://www.crugroup.com/about-cru/cruinsight/US_midwest_premiums, last visited Dec. 20, 2013.

[36] *Id.*

agreements caused an irrational movement in warehousing.  The amount of aluminum held in Midwest Warehousing controlled by the Goldman Defendants actually increased from the beginning of the Class Period at 850,000 tons to nearly 1.5 million tons in June 2013.[37]

57.    In exchange for the agreement for warehousers such as the Goldman Defendants, and the John Doe Defendants, to increase the daily minimums from 1,500 tons to 3,000 tons, the LME agreed to corresponding increases in storage rates.  Pursuant to agreements among the Defendants, the daily storage rental per ton in Midwest Warehousing increased from $0.40 in 2010[38] to $0.41 in 2011[39] to $0.45 in 2012.[40]  The 10% increase between 2011 and 2012 was highly irregular because the prior increase was closer to 2%.  In 2013, the rate increased to $0.48 per ton per day.[41]

58.    The rationale given to customers by the LME for the increases was that increases in minimum shipping requirements would lessen demand for storage and thus increases in

---

[37] *See* July 20 NY Times Report.

[38] *See Goldman to buy LME warehouse firm Metro,* Reuters, February 19, 2010, available at http://www.reuters.com/article/2010/02/19/us-goldman-metro-idUSTRE61I0ZH20100219,    last visited Dec. 20, 2013.

[39] *See* Carolyn Cui, *Banks Snap Up Warehouses --- Resource Storage Gives Lenders Profits in Tough Times, but Some Clients Complain of Bottlenecks*, Wall Street Journal, C1, July 5, 2011.

[40] *See, Banks outsmart metals storage rules to make millions*, Reuters, February 6, 2012, available at http://www.reuters.com/article/2012/02/06/lme-warehouses-idUSL5E8D62DU20120206, last visited Dec. 20, 2013.; Tom Vulcan, *Metals Warehousing: the Perfect Hedge and the Perfect Storm?*, Hard Asset Investor, March 23, 2012, available at http://www.hardassetsinvestor.com/features/3567-metals-warehousing-the-perfect-hedge-a-the-perfect-storm.html?showall=&fullart=1&start=3, last visited Dec. 20, 2013.

[41] *See*, July 20 NY Times Report.

storage price by weight were justified.[42]  Defendants knew, however, that storage times would

not in fact decrease but would increase as they have done throughout the Class Period.

59.    The large increase in the amount of aluminum in the Goldman Defendants'

warehouses and the steady increases in the Midwest Premium would not have occurred but for

the artificial, anticompetitive effects of Defendants' agreements in unreasonable restraint of

trade.  These efforts by the Goldman Defendants, along with the LME and other warehousers has

cost American consumers more than $5 billion over the last three years.[43]

60.    After the sale of the LME was completed in June 2012, Charles Li, the CEO of

Hong Kong Exchanges, which bought the LME, stated "If people have to wait a year, that's a

very big problem; it is a level-one issue. If somehow the LME system is making clients suffer in

that way, that is not acceptable."[44]

**E.    Senate Hearings in July 2013 and EC Action**

61.    In November 2012, Bloomberg News announced that the European Commission

("EC") initiated a review of the conduct and agreements alleged herein and contacted the LME.[45]

62.    The Commodity Futures Trading Commission has also initiated a review and has

asked companies to "retain, preserve, and safeguard against destruction all documents,

---

[42] *See, Banks outsmart metals storage rules to make millions*, Reuters, February 6, 2012, available at http://www.reuters.com/article/2012/02/06/lme-warehouses-idUSL5E8D62DU20120206, last visited Dec. 20, 2013. ("new rules were expected to dent queues… [but] warehouses [were] able to hike rents in response.")

[43] *See* NY Times Report.

[44] Maytaal Angel, *Insight: Trade Houses Trump Banks in Metals Storage Play*, Reuters, October 18, 2012, available at http://www.reuters.com/article/2012/10/18/us-lme-warehousing-idUSBRE89H0EW20121018, last visited Dec. 20, 2013.

[45] *See* Agnieszka Troszkiewicz, *EU Plans to Discuss Metal Premiums and LME Warehouse 'Issue'*, Reuters, Nov. 9, 2012, available at http://www.bloomberg.com/news/2012-11-09/eu-plans-to-discuss-metal-premiums-and-lme-warehouse-issue-1-.html, last visited Dec. 20, 2013.

communications, and other information and materials" concerning or relating to any warehouses that store physical metals against a futures contract, according to a letter, dated July 18, 2013 and mailed from the division of enforcement's Chicago office.[46]

63.     On July 23, 2013, the Senate Banking Committee held hearings on the role of financial institutions in commodities markets.

64.     In sworn testimony before the Senate[47], Tim Weiner, Global Risk Manager of Commodities and Metals for MillerCoors, joined by the Coca-Cola Company, Novelis, Ball Corp., Rexam, Dr. Pepper Snapple Group, D.G. Yuengling Brewing Company, North America Breweries, Rogue Brewery and Reynolds Consumer Products made the following statements about the impact to the aluminum market:

- Delivery delays do "not happen with any of the other commodities we purchase. When we buy barley we receive prompt delivery, the same with corn, natural gas and other commodities. *It is only with aluminum purchased through the LME that our property is held for an extraordinary period of time... [or we] pay the high physical premium to get aluminum today*."

- "My company and others estimate that last year alone, the LME warehouse rules have imposed an *additional $3 billion expense* on companies that purchase aluminum."

- "Although the LME has ordered strict minimum release requirements for warehouses controlled by LME members, *those minimums are being treated as maximums* and continue to *restrict the flow* of metal out to the market."

- "U.S. bank holding companies have *effective control of the LME*, and they have *created a bottleneck* which limits the supply of aluminum. Aluminum prices in general and for can sheet in particular have *remained inflated* relative to the massive oversupply and record production."

---

[46] *See*, Agnieszka Troszkiewicz, *CFTC's Chilton Says 'Thoughtful Review' of Warehouses Needed*, Bloomberg, Jul 22, 2013, available at http://www.bloomberg.com/news/2013-07-22/cftc-says-thoughtful-review-of-warehousing-needed-1-.html, last visited Dec. 20, 2013.

[47] Weiner Testimony at pp. 3-4.

- "the largest LME principal through December 2012 was Goldman Sachs, which through its ownership of Metro… control[s] 29 of the 37 warehouse locations at the LME approved warehouse site in Detroit. This site houses approximately one quarter of the aluminum stored in LME facilities globally and over 70% of the available aluminum in North America. Henry Bath (100% owned by JPMorgan), Glencore and other trading companies also own LME warehouses."

- "we have asked the UK Financial Services Authority (recently reorganized as the Financial Control Authority) and the CFTC to regulate the LME system as it pertains to the commodity metals market. Both agencies have indicated they are uncertain whether they have the regulatory authority necessary."

- *In direct discussion with the LME, "[t]he LME dismissed our proposals [to alleviate backlogs]."*

**F.     The Goldman Defendants Concede They Can Ship at Will**

65.     On July 31, 2013, after years of reaping millions of dollars in illicit storage fees (and untold amounts from commodities trading), the Goldman Defendants conceded that they could ship aluminum more quickly than they have. In a statement, Goldman said, "[i]n light of the concerns that end-users have raised about their access to aluminum they are holding in warehouses, Goldman Sachs is contacting end users to offer to swap any aluminum currently in the queue for immediately available aluminum so that they have access to the metal they need to make or package their products."[48]

66.     Defendants' newfound empathy and promises are contrary to Defendants' conduct from 2010 until July 2013.  Either the Goldman Defendants on their own, or the LME Defendants on their own, could have responded to these public complaints about (and could have ended) Defendants' upward impact on aluminum prices since late 2010 or early 2011.

67.     For example, Goldman could quickly have lifted its artificial restraints on shipments from its Midwest Warehousing.  For another example, as part of its approval of

---

[48] *See Goldman to offer Metro customers immediate access to aluminum,* Reuters, July 31, 2013, http://www.reuters.com/article/2013/07/31/goldman-aluminum-idUSL1N0G118V20130731, last visited, Dec. 20, 2013.

warehouses and/or its minimum shipping rule requirements, the LME could easily have taken multiple steps to alleviate the problem. For example, the LME could have disallowed netting of daily minimum requirements and disallowed warehousing incentives that Goldman recently abandoned, or offered rental rebates for metal stranded in the warehouse. Only by working cooperatively together in agreement as alleged herein, have Defendants, through their parallel individual and joint or mutual conduct, been able to continue to inflate prices and storage costs to their continued mutual profit.

68.     The large increase in the amount of aluminum in the Goldman Defendants' Warehouses and the steady increases in the aluminum prices (specifically the Midwest Premium Price) would not have occurred but for the artificial, anticompetitive effects of Defendants' agreements in restraint of trade.

### G.     Additional Developments in Furtherance of the Agreements

69.     As the premium buyers paid to obtain aluminum increased nearly 48% over the prior 12 months, on January 21, 2013, Chris Evans, the LME head of business development and a spokesman for the LME, stated in lengthy comments that, "I'm not sure there is a solution that the LME can provide to the market. Ultimately the solution has to come from the market itself."[49] Likewise in 2012, the LME represented that it had no power to resolve the issue, suggesting purchasers simply stop paying the prices if they believe they are unfair by stating, "[i]t's not our job to change the market, it's our job to reflect the market and fact that there are

---

[49] *See Solution to aluminum warehousing issues must come from market itself: LME exec San Diego* (Platts), Jan 21, 2013, reprinted with permission in blog comments, Novelis Blog Post of Nick Madden, Senior Vice President and Chief Supply Chain Officer, *Happy New Year? LME Warehouse hallenges Continue*, available at http://blog.novelis.com/happy-new-year-lme-warehouse-challenges-continue/, last visited Dec. 20, 2013.

queues is an accurate reflection of too much cheap money chasing hard commodities."[50] Through its representations in January 2013, February 2012 and at other times, the LME acquiesced in, empowered and enabled the anticompetitive conduct of the Goldman Defendants and the LME Defendants have publicly supported the conduct of the Goldman Defendants in their own financial interest to the detriment of other market participants while being fully knowledgeable of the conduct alleged herein.

70.     In January 2013, Novelis continued expressing its frustration with the supply problems.[51]

71.     As of June 2013, the wait for aluminum in Detroit was reportedly 469 calendar days.[52]

## VI.     THE LME's MONOPOLY POWER

72.     Throughout the Class Period, the LME has maintained monopoly power in the Relevant Markets alleged in Section VIII, below.  Competitors have been unable to successfully compete because of the agreements that the LME Defendants make with the Goldman Defendants and others, including the John Doe Defendants, that incentivize producers to direct business to the LME Defendants.  The LME Defendants have the ability to control the output of aluminum from LME-approved warehouses and the storage rates of such LME-approved warehouses.

---

[50] *See, Banks outsmart metals storage rules to make millions*, Reuters, February 6, 2012, available        at        http://www.reuters.com/article/2012/02/06/lme-warehouses-idUSL5E8D62DU20120206, last visited Dec. 20, 2013. (statement of CEO Martin Abbott).

[51] *See* Novelis Blog Post of Nick Madden, Senior Vice President and Chief Supply Chain Officer, *Happy New Year? LME Warehouse Challenges Continue*, available at http://blog.novelis.com/happy-new-year-lme-warehouse-challenges-continue/, last visited Dec. 20, 2013.

[52] *See*, http://www.cnbc.com/id/100892701, last visited Dec. 20, 2013.

73.    The LME has the right to approve any LME warehouse, including in the U.S., and has monopoly control over selection of the warehousing for exchange-traded aluminum in the U.S.

74.    The foregoing monopoly power extends to approving storage rates, minimum withdrawal rates and other matters as decided by the LME's Warehouse Committee.

75.    Since late 2010 or early 2011 the LME has had full knowledge of the facts alleged herein based on public complaints that they were inflating aluminum prices and that the LME abused its monopoly power as alleged herein.  This includes but is not limited to: (i) not basing their agreements with warehouse owners (and the minimum shipping requirements) on a percentage of the metal capacity or metals stored in each warehouse; (ii) not requiring netting of incoming aluminum allowing the Goldman Defendants to "shuttle", or making agreements that encouraged the Goldman Defendants to shuttle from warehouse to warehouse; (iii) using anti-competitively low minimum load-out rates; (iv) consenting to the conversion of the minimum rates to maximum rates in times of anomalously high storage; (v) approving the Goldman Defendants' charges and practices; (vi) allowing repeated increases in the Goldman Defendants' charges; (vii) allowing the Goldman Defendants to pay incentives to divert into, and restrain and engross more aluminum in LME Detroit Warehousing; (viii) making statements to deter companies that purchased aluminum from challenging such practices; and by the other steps alleged herein.

## VII.    THE GOLDMAN DEFENDANTS' MONOPOLY POWER

76.    Throughout the Class Period, the Goldman Defendants have had monopoly power in the Relevant Markets alleged in Section VIII, below.  The Goldman Defendants can control the output of LME-approved aluminum from Midwest Warehousing by controlling the rate at which Goldman ships aluminum above the agreed upon minimum load out rate.

26

77.     The Goldman Defendants have converted the minimum aluminum shipping requirements into a maximum and agreed with the LME to convert the minimum into a maximum.  Subsidized and incentivized by monopoly profits from its anticompetitive acts, the Goldman Defendants have made agreements in which it has paid as much as $230 per ton or more to producers to divert additional aluminum into the Midwest Warehousing.  The Goldman Defendants, without actually causing any output of aluminum from the warehouses to purchasers of physical aluminum, reportedly further abused such power by "shuttling" aluminum from one warehouse to another within Midwest Warehousing in order to meet the minimum quota.

78.     The Goldman Defendants have abused their monopoly power, the LME has abused its monopoly power, and Goldman and the LME have together engaged in anticompetitive conduct to abuse their monopoly power in order to divert aluminum into and limit the free alienability of aluminum stored in Midwest Warehousing.  Defendants have thereby inflated aluminum prices in the United States as well as the storage costs paid directly to the Goldman Defendants, a portion of which is paid to the LME.

79.     Unless enjoined as alleged herein, Defendants' ongoing agreement in restraint of trade and abuse and conversion of their monopoly power will spread to other LME warehouses to a greater extent than it already has, further exacerbating the anticompetitive impact on the U.S. economy.

## VIII.   THE RELEVANT MARKETS

80.     Plaintiff, based on the allegations contained herein, disclaims the need to plead a relevant market on its Sherman Act, Section 1 claims.  The restraint of trade alleged herein directly inflated prices, restricted supply, restrained the free alienability of aluminum in an anticompetitive manner and otherwise constitutes a *per se* violation of Section 1.

81.     The Relevant Markets of the Goldman Defendants include, in the alternative: (a) the market for aluminum in the United States; (b) the market for warehousing all LME and non-LME aluminum in Midwest Warehousing, or in the alternative; (c) the market for aluminum in the United States in which aluminum is purchased and sold based on the Midwest Premium Price or any price based on or derived therefrom.  The alternative geographical markets are the same as those contained in the alternative definitions of the product market.  Pursuant to its agreement with the LME, the Goldman Defendants have manipulated the market in which Plaintiff and other Class members purchased aluminum and have inflated prices in that market through anticompetitive conduct and agreements.

82.     The relevant markets of the LME include, in the alternative, one or more of the following: (a) the market for warehouse storage of aluminum in the United States in LME warehouses or, in the alternative, the market for warehouse storage of that portion of both LME warehouse aluminum and non-LME warehouse aluminum that is located in areas in which purchase and sale contracts for aluminum are based on the Midwest Premium Price or any price related thereto; (b) the market for providing exchange traded aluminum forward or futures contracts, including to approve warehouses for exchange-traded aluminum in the United States (the LME has had 97-99% of the aluminum futures contract trading and has had the power to approve the warehouses holding 95-100% of the aluminum for such trading); (c) the LME has the power to control or agree to the terms and operations of its warehouses that hold all the LME aluminum in the U.S.  Such warehouses also hold a large portion of all LME and non-LME aluminum stored by warehouses in the U.S.  The geographical market for the foregoing markets is the entire United States.

28

## IX.    EFFECTS ON INTERSTATE COMMERCE AND INJURY TO PLAINTIFF AND THE CLASS

83.    Defendants' unlawful acts alleged herein substantially affected interstate trade and commerce and caused antitrust injury to Plaintiff and all Class members.

84.    Defendants' unlawful acts alleged herein have had a substantial anticompetitive effect on interstate commerce within the U.S. including by inflating aluminum prices, restraining aluminum, reducing the effective availability of the supplies of aluminum in Midwest Warehousing and beyond.

85.    For one example, Defendants' unlawful agreement has caused indirect purchasers of aluminum in the United States to pay an unlawfully inflated and artificially and steadily increasing Midwest Premium to purchase aluminum.

86.    As a direct result of Defendants' violations, Plaintiff and the members of the Class have been damaged in their property or business, and have paid supra-competitive prices.

## X.    ANTITRUST INJURY

87.    The restraint of trade and anticompetitive conduct alleged herein and engaged in by Defendants had severe adverse consequences on competition, prices, efficiency and transparency in storage services, and the level of available output of aluminum.  Plaintiff and other members of the Class were deprived of normal, competitive aluminum prices.  Aluminum purchasers were subjected to artificially inflated prices and price-trends as a direct, foreseeable and intended result of the Defendants' unlawful and manipulative conduct.  As a consequence thereof, Plaintiff and the Class suffered financial losses and were, therefore, injured in their business or property.

## CLASS ACTION ALLEGATIONS

88.     Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a),

(b)(2) and/or (b)(3) on behalf of the following Classes:

> All persons and entities who purchased aluminum indirectly from Defendants and/or their co-conspirators from February 1, 2010 through the present (the "Class Period"), in the following states: Alabama, Alaska, Arizona, Arkansas, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and Wyoming (the "Damages Class").

> All persons and entities who purchased aluminum indirectly from Defendants and/or their co-conspirators from February 1, 2010 through the present (the "Class Period") throughout the United States (the "Injunctive Class").

89.     The Classes exclude Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

90.     The Classes are so numerous that joinder of all members is impracticable.

91.     A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

92.     Plaintiff's claims are typical of the claims of the Classes.   As alleged herein, Plaintiff and members of the Classes all sustained damages arising out of the Defendants' same course of unlawful conduct.

93.     There are questions of law and fact common to the Classes, including but not limited to:

- Whether Defendants monopolized, attempted to monopolize or conspired to monopolize in violation of law;

- Whether Defendants made agreements in unreasonable restraint of trade;

- Whether Defendants combined, conspired and agreed to restrain supplies or inflate prices of aluminum;

- Whether such violations inflated such prices of aluminum;

- Whether the actions of Defendants in so conspiring violated Section 1 of the Sherman Act;

- Whether the alleged conspiracy violated state antitrust statutes;

- Whether the alleged conspiracy violated state consumer protection and unfair competition statutes;

- Whether Defendants unjustly enriched themselves to the detriment of Plaintiff and the members of the Class, thereby entitling Plaintiff and the members of the Class to disgorgement of all benefits derived by Defendants;

- Whether such inflation caused antitrust injury to the property of Plaintiff and Class members;

- Whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted; and

- Whether injunctive relief enjoining the reoccurrence of Defendants' conduct and/or declaratory relief that such conduct is unlawful, is warranted.

94.     The interest of Class members in individually controlling the prosecution of separate actions is theoretical and not practical.  The Classes have a high degree of similarity and are cohesive.  Prosecution of the action through multiple representatives would be objectionable and Plaintiff anticipates no difficulty in the management of this matter as a class action.

95.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants.

96.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Classes would create a risk of adjudication with respect to individual members of the Classes which would, as a

practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

97.     Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

98.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**FIRST CAUSE OF ACTION**
**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE**
**CLAYTON ACT FOR VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT**

99.     Plaintiff incorporates the preceding allegations by reference.

100.    Defendants and unnamed conspirators entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).   Defendants agreement to manipulate warehouse inventories and queues to directly, foreseeably, artificially and intentionally inflate prices for aluminum in the U.S., including the Midwest Premium component of prices was a violation of the Sherman Act

101.    The acts done by each Defendant as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

102.    Beginning at least as early as February 1, 2010, and continuing through the present, Defendants and their co-conspirators, by and through their officers, directors, employees, agents and/or other representatives, entered into and participated in a continuing

agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, maintain and stabilize prices and premiums for aluminum sold in the United States.

103.   Defendants' anti-competitive acts were intentionally directed at the market for aluminum and had a substantial and foreseeable effect on interstate commerce throughout the United States.

104.   Defendants' conspiratorial acts and combinations have harmed competition and caused unreasonable restraints of trade in the aluminum market.

105.   As a result of Defendants' unlawful agreement, understanding, combination, contract and conspiracy, Plaintiff and other members of the Class have been injured in their business and property.  Plaintiff and other Class members have been harmed by being forced to pay higher prices for aluminum than they otherwise would have paid in the absence of Defendants' conspiracy. This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

106.   In formulating and carrying out their unlawful agreement, understanding, combination, contract and conspiracy, Defendants and their co-conspirators actually did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

107.   Defendants' contract, combination, and conspiracy in restraint of trade had the following effects, among others:

> a.  Price competition in the aluminum market has been restrained, suppressed and/or eliminated in the United States;
>
> b.  Prices for aluminum sold by Defendants have been fixed, raised, maintained and stabilized at artificially high, supra-competitive levels throughout the United States; and
>
> c.  Plaintiff and members of the Class have been deprived of the benefits of free and open competition.

33

108.   In furtherance of the unlawful conspiracy, Defendants and their co-conspirators have committed overt acts, including, *inter alia*:

- Defendants agreed to leverage inflated revenues to pay increased incentives to store aluminum in their warehouses, enhancing market control and leading to additional price increases and delay;

- Defendants entered into an agreement establishing a shipping minimum on a per city rather than a per warehouse basis such that it was possible to concentrate warehousing in industrial centers, rendering the requirements ineffective and allowing backlogs and artificial cost increases;

- Defendants established minimum shipping requirements based upon an absolute number of tons rather than a more rational amount relative to warehouse capacity, or percentage of supply, thus it was possible to concentrate warehousing in industrial centers, rendering the requirements ineffective and allowing backlogs and artificial cost increases;

- Defendants established minimum shipping requirements based on gross numbers, which allowed "shuttling" of metals between warehouses to count toward the minimum, rendering the requirements ineffective and allowing backlogs and artificial cost increases;

- Defendants agreed to transform the minimum shipping requirement into maximums, rendering the requirements ineffective and allowing backlogs and artificial cost increases;

- Defendants agreed to a maximum shipping rate that was a small fraction of what should have been possible in an efficient market, rendering the requirements ineffective and allowing backlogs and artificial cost increases;

- Defendants agreed to cause a critical mass of aluminum to be built up at their LME warehouses which was used to influence aluminum prices.

- Defendants agreed to unreasonably high storage rates and quid pro quo increases as compensation for decreased storage times that were purported to result from increased daily delivery requirements, but which were known by Defendants at the time to be illusory and made costs even higher;

- Defendants agreed, as a necessary, intended and direct effect, inextricably intertwined with their other conduct, to inflate prices for aluminum in a market environment that should have dictated price movement in the opposite direction.

34

109.    The combination and conspiracy alleged herein has had the following effects, among others:

    a.  Price competition in the sale of aluminum has been restrained, suppressed, or eliminated;

    b.  Prices for aluminum have been fixed, raised, maintained, or stabilized at artificially high, non-competitive levels; and

    c.  Plaintiff and members of the Class have been deprived of the benefits of free and open competition.

110.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise or stabilize prices of aluminum.  As a direct and proximate result of the illegal agreement, contract, combination, or conspiracy between Defendants, Plaintiff and the members of the Class have been injured and damaged in their respective businesses and property.

111.    The conduct of Defendants and their co-conspirators constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiff and the Class seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not reoccur in the future.

## SECOND CAUSE OF ACTION
## FOR VIOLATIONS OF STATE ANTITRUST STATUTES

112.    Plaintiff incorporates the preceding allegations by reference.

113.    From at least as early as February 1, 2010, through the present, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of aluminum in unreasonable restraint of trade and commerce and in violation of the various state statutes set forth below.

114.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to manipulate LME warehouse inventories, including artificially extending warehouse queues, to prop up the Midwest Premium, which caused artificially supracompetitive pricing levels for aluminum in the United States.

115.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including, participating in conversations and communications among themselves to implement, adhere to and police the unlawful agreements they reached.

116.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to manipulate the aluminum market in order to benefit from exorbitant rents and trading positions.

117.    Plaintiff asserts this claim under the laws of its state of residence, Arkansas, and as representative of the proposed Class of indirect purchasers residing in states with indirect purchaser laws similar to their states such that the common questions of law and fact raised in this claim will predominate under Fed. R. Civ. P. 23(b)(3).

118.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Ala. Code. § 6-5-60(a).

119.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Alaska Stat. § 45.50.576.

120.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-101, *et seq*.

121.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Ark. Code. Ann. §§ 4-75-211, *et seq*.

36

122.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

123.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated, §§ 28-4501, *et seq.*

124.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Haw. Rev. Stat. §§ 480-1 *et seq.*

125.   Defendants have entered into an unlawful agreement in restraint of trade in violation of 740 Ill. Comp. Stat. § 10/7(2).

126.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code, §§ 553.1, *et seq.*

127.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

128.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, 10 M.R.S. §§ 1101, *et seq.*

129.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan compiled Law Annotated, §§ 445.771, *et seq.*

130.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes, §§ 325D.49, *et seq.*

131.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated, §§ 75-21-1, *et seq.*

132.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Mont. Code Ann. § 30-14-202 et. seq.

133.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes, §§ 59-801, *et seq.*

134.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated, §§ 598A.010, *et seq.*

135.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated, §§ 57-1-1, *et seq.*

136.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws, § 340, *et seq.*

137.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes, §§ 75-1, *et seq.*

138.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code, §§ 51-08.1-01, *et seq.*

139.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Gen.Laws 1956, RI ST .§ 6-36-10.

140.   Defendants have entered into an unlawful agreement in restraint of trade in violation of S.C. Code Ann. § 39-3-30.

141.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws, §§ 37-1-3.1, *et seq.*

142.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated, §§ 47-25-101, *et seq.*

143.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated, §§ 76-10-3101, *et seq.*

144.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2451, *et seq.*

145.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code, §§ 47-18-1, *et seq.*

146.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes, §§ 133.01, *et seq.*

147.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wyo. Stat. Ann. § 40-4-114.

148.    Plaintiff and members of the Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy or agreement.  Plaintiff and members of the Class have paid more for aluminum than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

149.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anti-competitive conduct come at the expense and detriment of Plaintiff and the members of the Class.

150.    Accordingly, Plaintiff and the members of the Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's applicable law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### THIRD CAUSE OF ACTION
### FOR VIOLATIONS OF STATE CONSUMER PROTECTION AND UNFAIR COMPETITION STATUTES

151.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

152.   From at least as early as February 1, 2010, through the present, Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices with respect to the sale of aluminum in violation of the following state consumer protection and unfair competition statutes.

153.   Plaintiff asserts this claim under the laws of its state of residence, Arkansas, and as representative of the proposed Class of indirect purchasers residing in states with indirect purchaser laws similar to their states such that the common questions of law and fact raised in this claim will predominate under Fed. R. Civ. P. 23(b)(3).

154.   Defendants have violated Alaska Stat. § 45.50.531.

155.   Defendants have violated Ariz Rev. Stat. §§ 44-1521 *et seq.*

156.   Defendants have violated Arkansas Code §§ 4-88-101 *et seq.*

157.   Defendants have violated California Bus & Prof. Code §§ 17200 *et seq.*

158.   Defendants have violated D.C. Code Ann. §28-3901 *et seq.*

159.   Defendants have violated Florida Stat. §§ 501.201 *et seq.*

160.   Defendants have violated Hawaii Rev. Stat. § 480-2.

161.   Defendants have violated Kan. Stat. Ann. §§ 50-623 *et seq.*

162.   Defendants have violated Mass. Gen. Laws chapter 93A §§ 1 *et seq.*

163.   Defendants have violated Mich. Comp. Laws § 445.901.

164.   Defendants have violated Minn. Stat. §§ 325F.69 *et seq.*

165.   Defendants have violated Miss. Code §§ 75-24-1 *et seq.*

166.   Defendants have violated Mo. Ann. Stat. 407.020.

167.   Defendants have violated Nebraska Rev. Stat. §§ 59-1601 *et seq.*

168.   Defendants have violated Nev. Rev. Stat. §§ 598.0903 *et seq.*

169.   Defendants have violated New Hampshire Rev. Stat. §§ 358-A:1 *et seq.*

170.   Defendants have violated New Mexico Stat. Ann. §§ 57-12-1 *et seq.*

171.   Defendants have violated N.Y. Gen. Bus. Law § 349 *et seq.*

172.   Defendants have violated North Carolina Gen. Stat. §§ 75-1.1 *et seq.*

173.   Defendants have violated Rhode Island Gen. Laws §§ 6-13.1-1 *et seq.*

174.   Defendants have violated S.C. Code Ann., §§ 39-5-10, *et seq.*

175.   Defendants' intentional and purposeful anti-competitive acts, described above, were intended to and did cause Plaintiff to pay supracompetitive, artificially inflated prices for the aluminum purchased in the states listed above.

176.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class members have been injured in their business and property in that they paid more for aluminum than they otherwise would have paid in the absence of Defendants' unlawful conduct.

177.   Plaintiff and Class members are therefore entitled to all appropriate relief as provided for by the laws of the states listed above, including but not limited to, actual damages, injunctive relief, attorneys' fees, and equitable relief, such as restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which may have been obtained by Defendants as a result of their unlawful conduct

## FOURTH CAUSE OF ACTION
## UNJUST ENRICHMENT

178.   Plaintiff incorporates by reference the allegations in the preceding paragraphs.

179.   As a result of their unlawful conduct described above, Defendants have been unjustly enriched. Defendants have been unlawfully enriched by their receipt of unlawfully inflated warehousing fees and other unlawful profits related to the sales of aluminum.

180.   Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from these acts, including any overpayments made by Plaintiff or the members of the Class for aluminum.

181.   Plaintiff and the members of the Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust and inequitable conduct. Plaintiff and the members of the Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendants and in favor of Plaintiff and the Class and award the following relief:

A.   That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representative of the Class and Plaintiff's counsel as counsel for the Class;

B.   That the conduct alleged herein be declared, adjudged and decreed to be unlawful;

D.   Compensatory, consequential, and general damages in an amount to be determined at trial;

E.   Costs and disbursements of the action;

F.   Restitution and/or disgorgement of Defendants' ill-gotten gains, and the imposition of an equitable constructive trust over all such amounts for the benefit of the Class;

G.   Pre- and post-judgment interest;

H.   Reasonable attorneys' fees; and

I.   That Defendants be enjoined from the conduct challenged herein;

J.      Such monetary, injunctive other relief to each of the subclasses that is provided

for by the state statutes pursuant to each Count alleged; and

K.      Such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all claims in this action.

Dated December 23, 2013                           Respectfully submitted,

                                                  **KESSLER TOPAZ**
                                                  **MELTZER & CHECK, LLP**


                                                  Joseph H. Meltzer
                                                  Edward W. Ciolko
                                                  Terence S. Ziegler
                                                  280 King of Prussia Road
                                                  Radnor, PA  19087
                                                  Tel: (610) 667-7706
                                                  Fax: (610) 667-7056

                                                  **GIBSON & KEITH, PLLC**
                                                  C.C. Gibson, III
                                                  119 South Main Street
                                                  Post Office Drawer 447
                                                  Monticello, AR  71657-0447
                                                  Tel: (870) 367-2438
                                                  Fax: (870) 367-8306

                                                  **THE MILLER LAW FIRM, P.C.**
                                                  E. Powell Miller
                                                  Marc L. Newman
                                                  Sharon S. Almonrode
                                                  Miller Building,
                                                  950 West University Drive, Suite 300
                                                  Rochester, MI 48307
                                                  Tel:  (248) 841-2200
                                                  Fax:  (248) 652-2852

                                                  *Attorneys for Plaintiff*